Staples, J.,
delivered the opinion of the court.
This is an action of assumpsit'brought in the Circuit court of the city of Richmond by the “Bank of the Old Dominion” against William 1ST. McVeigh, to recover certain money belonging to the plaintiff', which as is alleged,was collected by the defendant in the year 1863. During the trial instructions were asked for by plaintiff and defendant respectively, which were re *197 fused by the court; and in lieu thereof certain other instructions given; to which both parties excepted. There was a verdict and judgment for the plaintiff; to which the defendant applied for and obtained a writ of error and supersedeas. It is not necessary to consider , . L . the various questions presented by these instructions. It will be sufficient to examine the two main grounds upon which defendant relies for a reversal of the judgment.
The first of these is, that the defendant in the year 1861 having left the city of Alexandria, where the bank was situated, having permanently located within the Confederate lines, his official connection with the bank as president was thereby dissolved, and his relations to that institution thereafter were those of a public enemy; and consequently no contract, express or implied, could arise between the parties during the existence of such hostile relations, and no action can be maintained against the defendant for any act done by him as president or agent of said bank during that period. In order fully to comprehend the doctrine here asserted, it is necessary to give some attention to the evidence. It appears from the defendant’s own admissions, that although residing within the Confederate lines after the 11th of June 1861, he undertook to act as president of said bank; and in that character he collected from the state money belonging to the plaintiff. We must suppose that he honestly entertained the opinion that he had the right so to do. Any other supposition would be a direct imputation upon his good faith and fair dealing.
After the close of the war, in July 1865, the defendant addressed a communication to the stockholders of the bank, in which he gives a history of his official conduct during the period of his separation from the *198 institution, and his reasons for collecting the funds belonging to it. He states that being separated from the board of directors by military forces he had to act Up0n pis pest judgment, and upon the judgment of others with whom he advised. As president of the x bank he collected in November 1861 of the state treasurer fifteen hundred and seventy-five dollars, being balance of interest due the bank 1st July 1861. On the 4th January 1862 he collected eight thousand one hundred and ninety dollars, the interest to January 1862; which several sums, after the payment of certain claims against the bank, were deposited to its credit in the bank of Virginia. And on the 8th of February 1863 he collected twenty-six thousand six hundred and ninety-seven dollars, the interest due on the state bonds up to the 1st of January 1863, and invested the same, or nearly the same, amount in a Confederate convertible or call certificate, bearing six per cent, interest. The present controversy is in reference to this latter sum.
Now the position assumed in the instructions and in the argument of the defendant’s counsel is, that the-defendant’s office or agency was abrogated by the war—that the act of the defendant as president, in collecting plaintiff’s money, was null and void—that this act could not be ratified after the war by the plaintiff or defendant, so as'to create a cause of action ex contractu against the defendant. Conceding all this, how does it relieve the defendant of the obligation to account to the plaintiff for money collected without authority, and appropriated to the defendant’s individual use and benefit. It is a matter of no sort of consequence that he was not authorized to act as president: having undertaken to do so, he cannot set up the illegality of his own conduct to avoid the just responsibility arising out of the agency he assumed. It has *199 been held m several cases, where money is received by , „ „ ........ . . an agent by force of a contract which is illegal, he cannot protect himself from accounting for what was so received by relying upon the illegality of the transaetion in which it was paid to him. Sharp v. Taylor, 2 Phil. Ch. R. 801.
In Terrant v. Elliott, 1 Bos. & Pul. 3, the defendant, an insurance broker, having effected an illegal insurance for the plaintiff, and received the amount of a loss, endeavored to defend himself against the claim of his principal by showing the illegality of the insurance; but it was held the plaintiff was entitled to recover. McBlair v. Gibbes, 17 How. U. S. R. 236; Kinsman v. Parkhurst, 18 How. U. S. R. 289; 7 Rob. Prac. 455-6.
A fortiori does this principle apply, where the plaintiff is entirely free from censure, and the illegality of the transaction, if it be such, is attributable to the defendant aloñe.
The learned counsel argued this branch of the case upon the theory, that war ipso facto operates as a confiscation of the title to all property belonging to alien enemies, and that any person appropriating or holding such property cannot be required to account for the same to the former owner after peace is restored. But clearly war has no such effect. While it gives to the government authority to confiscate the property of an enemy, it does not itself confiscate, nor confer upon individuals such authority. If the government does not exercise the power, the title remains unchanged. During the existence of hostilities, the owners’ remedies for its protection or recovery are suspended; but so soon as peace is restored, these remedies revive as fully and effectually as though they had never been disturbed. This is the doctrine everywhere sustained by *200 the comity of states. Ware v. Hylton, 3 Dallas’ R. 199, 226; Brown v. United States, 8 Cranch’s R. 170.
The learned counsel insists, however, that the defendant being a mere tort feasor, the action against him ought also to have been in tort. But it is well settled, that in cases of this sort the plaintiff has his election of remedies. He may, if he ple&ses, waive the tort and sue in assumpsit. Indeed assumpsit is the appropriate remedy whenever the defendant has received plaintiff’s money, which in equity and good conscience he ought not to retain. 1 Rob. Prac. 484.
The defendant’s second ground of defence is contained in the fifth, sixth, seventh and eighth instructions, offered by him, and rejected by the court. The main proposition asserted in these instructions is, that the defendant having acted in good faith in collecting the money from the state and investing it in Confederate call certificates, the said certificates became thereby the property of the bank, and the defendant is not responsible in this suit for any loss or damage which the bank may have sustained by reason of the action of the defendant.
It will be observed that the proposition here asserted leaves out of view the important fact established by the evidence, that after the defendant had converted the certificates into treasury notes, as required by the Confederate government, he deposited the money in bank to the credit of C. A. Baldwin & Co., of which firm he was a member; and subsequently the entire amount, together with the other funds of the said firm, was invested in tobacco and other articles. This investment, as the defendant states, was made at his individual risk, he being confident it would pay him the interest, and save to the bank the heavy Confederate tax. He further states that the articles so pur *201 chased were destroyed by fires that occurred at Columbia, Charlotte and the city of Richmond, at which places the said firm had stored the property.
It .thus appears that the fund did not perish upon the hands of the defendant, but was loaned by him to a firm of which he was a member, and was invested by that firm in private trade and speculation. It may be that the goods were destroyed, but we have no means of ascertaining the circumstances under which the destruction occurred. We do not know whether it might not have been prevented by the exercise of due care-and diligence: whether considerable profits may not have been realized from this fund by previous investments. Upon these points the record furnishes no information; no inquiry was asked upon the subject; no issue made up. The defendant nowhere as sers that the money was wholly lost by him. He does not say that no profits were realized from its use; nor does he rest his defence upon the destruction of the property. Ho such ground is taken in the instructions or in the argument. The learned counsel was too well satisfied it could not be maintained. The defendant having appropriated the plaintiff’s money, having invested it in trade and speculation, must of course account for it, however unfortunate the speculation may have proved. The defendant is to be regarded simply as a borrower of the fund. His use of it, whether .judicious or otherwise, whether profitable or not, cannot affect the right of the creditor.
The case is wholly unlike that of Davis v. Harman, 20 Gratt. 197. There the fund was in the hands of a commissioner acting under the order of a court of chancery. He did not appropriate a dollar of it to his own use; but deposited it in bank, where it perished with the fall of the Confederate government.
*202 Nor does the case bear any resemblance to that of Pidgeon v. Williams, 21 Gratt. 251. In that case the money was also deposited in bank; was so marked as to ke easily identified as the property of the plaintiff; and so remained in the bank until the termination of' . the war, and the consequent destruction of the currency.
The defendant is charged only with the value of the Confederate notes at the time they were appropriated by him; and with this we think he has no just cause of complaint. The verdict and judgment, however, bear interest from the 1st day of April 1864. The interest ought to be computed only from the close of the-war; for the plain reason, that plaintiff and defendant were, until that date, residents of hostile sections. To this extent the judgment must be amended and affirmed, with costs to the defendant in error. In thus affirming it, we see no reason to impute any blame to the defendant. He seems to have acted throughout with a conscientious regard for what he considered the best interests of the bank. But his motives, however conscientious, cannot exonerate him from liability for his collection and appropriation of money belonging to the plaintiff
Judgment amended and appirmed.